IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

BARNEY HOLLAND OIL COMPANY,  §
                             §
          Plaintiff,         §
                             §
VS.                          §   NO. 4:06-CV-183-A
                             §
FLEETCOR TECHNOLOGIES, INC., §
ET AL.,                      §
                             §
          Defendants.        §

<u>MEMORANDUM OPINION</u>
and
<u>ORDER</u>

After having considered the motion for summary judgment filed in the above-captioned action on August 14, 2006, by defendants, FleetCor Technologies, Inc., and FleetCor Technologies Operating Company, LLC, ("FleetCor")[1] the court has concluded that such motion should be granted in part and denied in part.

I.

<u>Plaintiff's Claims</u>

The current pleading of plaintiff, Barney Holland Oil Company, is its first amended complaint, filed July 18, 2006.

---

[1]The parties are in agreement that the two defendants as well as the entity once known as Fleetman, Inc., which is a party to relevant documents, can be treated as one and the same for purposes of the motion for summary judgment. The abbreviated reference "FleetCor" refers to each and all of them, as applicable.

Plaintiff alleges that:[2]

FleetCor operates a fuel card program ("Fuelman System") by which businesses and governmental entities with fleets of automobiles, trucks, or other vehicles can acquire fuel at participating retail fuel sites around the country.  In October 1995 plaintiff and FleetCor entered into a license agreement pursuant to which FleetCor granted plaintiff the exclusive right to market the Fuelman System in the Dallas/Fort Worth ("DFW") territory, consisting of Tarrant and Dallas Counties and twenty-two other counties in the same area.  Since the license agreement was entered into, plaintiff has made extensive investments in, and continues to operate, the program in the DFW territory, has developed a large number of business relationships, and has entered into long-term contracts with various entities to develop the program in that territory.  The business relationships and long-term contracts primarily are with retail service stations and unattended fuel sites ("merchants") and with commercial fleet owners, independent school districts, municipalities, federal, state, and county governmental entities and other end-users of fuel ("customers").

_____

[2]The descriptions given in the text of the allegations of the complaint are significantly abbreviated.  When describing the distinct claims alleged by plaintiff, the court is, for the most part, adopting the characterizations of the claims used by defendants in their brief in support of the motion for summary judgment. Counsel for plaintiff basically agreed with the accuracy of those characterizations during a telephone conference/hearing conducted between the court and counsel on October 19, 2006.  Tr. of Oct. 19, 2006, Conf./Hr'g at 7-8.

An important feature of the Fuelman System is that it incorporates pre-purchase controls that restrict a driver's ability to use the Fuelman card to transactions that comply with restrictions established by the Fuelman System customer for whom the driver works, including types and grades of fuel, gallon limits per fill-up, gallon limits per week, and fueling events per day and/or per week.  Plaintiff is obligated contractually to many of its customers to maintain those controls in place, and is obligated to other customers to honor good-faith representations that the controls will be kept in place.

Until 2001, FleetCor operated the nationwide Fuelman System primarily through thirty licensees, each of whom had the exclusive right to market the program within a defined geographical territory.  Commencing in 2001 FleetCor has engaged in an effort to terminate the license agreements so that it might operate the program directly.  It now has terminated twenty-nine of its thirty licensees, leaving plaintiff as the only operating licensee.  In 2002 plaintiff and FleetCor engaged in negotiations that, if successful, would have led to the termination of plaintiff's license.  When the negotiations failed, FleetCor embarked on a campaign to (i) damage plaintiff and (ii) destroy the value of plaintiff's DFW Fuelman System territory, all in an attempt to force plaintiff to accept less than the fair market value for its business.

Before plaintiff and FleetCor entered into the October 1995 license agreement, they, in February 1995, entered into an

3

agreement entitled "Bridging Agreement."  At that time plaintiff was participating as a licensee in a fuel card program known as "Gascard."  In October 1995 FleetCor acquired the Gascard operations.  The Bridging Agreement was entered into in anticipation of FleetCor's acquisition of Gascard, and it provided the terms and conditions for a multitude of relationships between the parties, including plaintiff's continued participation in the Gascard program and the conditions for establishing a Fuelman System license for plaintiff covering the DFW territory.  The Bridging Agreement, which continues to govern certain relations between the parties, contains a "favored nations" provision that affects the Fuelman System license agreement the parties ultimately entered into in October 1995.

In or about August 2001, FleetCor entered into agreements with a number of other Fuelman System licensees that amended their respective license agreements by providing each of those licensees with a clear and exclusive right to market, in the licensee's territory, all new products and services offered by FleetCor.  Pursuant to the favored nations provision in the Bridging Agreement, plaintiff is entitled to incorporate that term and condition into its license agreement.  Plaintiff has made repeated demands on FleetCor to review all Fuelman System license agreements, including all amendments thereto, in order to determine whether there are other favorable provisions that plaintiff might elect to incorporate into its license agreement.

4

FleetCor has refused to allow plaintiff to have access to the other agreements.

*     *     *     *     *     *

The legal theories into which plaintiff channels its alleged facts are breach of contract, tortious interference, and de facto termination of the October 1995 license agreement.

Briefly stated, plaintiff's breach of contract theories are as follows:

1.   Failure to Maintain a Nationwide System of Licensees. Plaintiff contends that FleetCor agreed in their license agreement to build and maintain a nationwide network of Fuelman System licensees, and breached that agreement by acquiring for direct operation by FleetCor the territories of all other Fuelman System licensees.

2.   Establishing Fuelman Locations Within the DFW Territory.  Plaintiff contends that the conduct of FleetCor in entering into agreements with Shell and other national merchants to establish Fuelman locations in the DFW territory violated plaintiff's exclusive right under the license agreement to operate a Fuelman license in that territory.

3.   National Merchant Agreements that Eliminated Some Pre-Purchase Controls.  Plaintiff asserts that FleetCor breached the license agreement by entering into agreements with national merchants for the use of Fuelman cards that eliminate some of the pre-purchase controls on Fuelman System transactions.

4.    "Retail-Minus" National Merchant Agreement.  Plaintiff contends that FleetCor was contractually obligated by the license agreement to price fuel involved in Fuelman System transactions on a cost-plus basis, and that FleetCor violated the agreement by entering into an agreement with a national merchant for purchase of fuel on a retail-minus basis.

5.    Failure to Escrow the Fuelman Source Code.  Plaintiff maintains that the license agreement obligates FleetCor to deposit all proprietary source codes for the software used in the operations of the Fuelman System with an escrow agent mutually agreed to by FleetCor and plaintiff, and that FleetCor violated the agreement by failing to do so.

6.    Expert Assistance and Support.  Plaintiff asserts that FleetCor assumed an obligation under the license agreement to provide expert assistance and support in the technical aspects of operating the Fuelman System, and that FleetCor violated that obligation by failing to provide the required assistance and support.

7.    Departure of Plaintiff's Employees.  Plaintiff contends that it and FleetCor agreed that the negotiations they had for the sale by plaintiff of its Fuelman System business to FleetCor would be confidential, and that after those negotiations failed FleetCor leaked word within the industry that it had acquired plaintiff's Fuelman System business, causing several of plaintiff's employees to leave plaintiff.

8.   <u>CFN; FleetAll; MasterCard</u>.   Plaintiff contends that
FleetCor breached the license agreement by marketing Commercial
Fueling Network ("CFN") cards in plaintiff's exclusive Fuelman
System territory.[3]   A similar claim is made in reference to the
alleged marketing by Fleetcor, in conjunction with a company
called ComData, of a FleetAll card in the DFW territory and the
alleged marketing by FleetCor, through ComData, of a MasterCard
in the DFW territory.   Apparently plaintiff also contends as to
these cards that the favored nations provision in the Bridging
Agreement operated to cause the license agreement to be amended
to provide that plaintiff had an exclusive right to market these
cards, which plaintiff characterizes as new products and services
offered by FleetCor.

9.   <u>Favored Nations Provision</u>.   Plaintiff maintains that
FleetCor has violated the favored nations provision of the
Bridging Agreement by failing to disclose to plaintiff the terms
and conditions of other license agreements so that plaintiff
might evaluate whether to exercise the right it contends it has
to cause more favorable terms to be incorporated into its license
agreement.

The tortious interference claims are based on the same sets
of facts on which the breach of contract claims related to the

_____

[3]The allegation relative to the CFN cards is that FleetCor
recently acquired Commercial Fueling Network, a former Fleet fueling
competitor, and is now actively marketing CFN cards and sites in the
DFW territory, which clear directly through FleetCor or third
parties, in violation of a right plaintiff claims it has to market
FleetCor products and services in the DFW territory.

changes in pre-purchase controls and the making of a retail-minus agreement with a national merchant are based.  According to plaintiff, those activities by FleetCor tortiously interfered with plaintiff's business relationships with its customers and merchants.

The theory of de facto termination of the license agreement is two-pronged.  First, plaintiff contends that the actions of FleetCor described in the complaint destroyed plaintiff's ability to fully realize the benefits of its license agreement, with the result that FleetCor caused a de facto termination of plaintiff's rights under the agreement, giving plaintiff entitlement to a recovery from FleetCor of the fair market value of its Fuelman System operation.  Alternatively, plaintiff asserts that FleetCor's actions constitute a de facto election by FleetCor to terminate plaintiff's right to exclusive operation of the Fuelman System within the DFW territory, giving plaintiff the right to recover the liquidated damages set forth in the Licensor Termination Provision contained in the October 1995 license agreement.

Plaintiff alleges that FleetCor's breaches of contract and acts of tortious interference are, jointly and severally, a proximate and producing cause of actual damages to plaintiff for which plaintiff seeks recovery.  In addition, plaintiff seeks punitive damages, reasonable attorneys' fees, pre-judgment and post-judgment interest, and permanent injunctive relief.

II.

## Grounds of FleetCor's Motion

Generally speaking, FleetCor concedes in its motion the facts alleged by plaintiff concerning the existence, history, and nature of the relationships between plaintiff and FleetCor. However, FleetCor disagrees with conclusions alleged by plaintiff as to the effect of those relationships and as to whether FleetCor's conduct has infringed on rights acquired by plaintiff through their relationships.

FleetCor maintains in its motion that all of plaintiff's claims are precluded by the terms of the operative contracts and by undisputed facts. As to certain of the theories of recovery, FleetCor also maintains that there is no evidence to support one or more of the facts essential to the theories. Other contentions made by FleetCor in its motion will be considered in the course of the analysis of the viability of plaintiff's claims and theories of recovery.

III.

## Analysis

A.   Applicable Summary Judgment Principles

A party is entitled to summary judgment on all or any part of a claim as to which there is no genuine issue of material fact and as to which the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). The moving party has the initial burden of showing that there is no genuine issue of material

9

fact.  _Anderson_, 477 U.S. at 256.  The movant may discharge this burden by pointing out the absence of evidence to support one or more essential elements of the non-moving party's claim "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  _Celotex Corp. v. Catrett_, 477 U.S. 317, 323-25 (1986).  Once the moving party has carried its burden under Rule 56(c), the non-moving party must do more than merely show that there is some metaphysical doubt as to the material facts. _Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp._, 475 U.S. 574, 586 (1986).  The party opposing the motion may not rest on mere allegations or denials of pleading, but must set forth specific facts showing a genuine issue for trial.  _Anderson_, 477 U.S. at 248, 256.  To meet this burden, the nonmovant must "identify specific evidence in the record and articulate the 'precise manner' in which that evidence support[s] [its] claim[s]."  _Forsyth v. Barr_, 19 F.3d 1527, 1537 (5th Cir. 1994). An issue is material only if its resolution could affect the outcome of the action.  _Anderson_, 477 U.S. at 248.  Unsupported allegations, conclusory in nature, are insufficient to defeat a proper motion for summary judgment.  _Simmons v. Lyons_, 746 F.2d 265, 269 (5th Cir. 1984).

The standard for granting a motion for summary judgment is the same as the standard for rendering judgment as a matter of law.  _Celotex Corp._, 477 U.S. at 323.  If the record taken as a whole could not lead a rational trier of fact to find for the

non-moving party, there is no genuine issue for trial.

<u>Matsushita</u>, 475 U.S. at 597.   <u>See also</u> <u>Boeing Co. v. Shipman</u>, 411

F.2d 365, 374-75 (5th Cir. 1969) (en banc) (explaining the

standard to be applied in determining whether the court should

enter judgment on motions for directed verdict or for judgment

notwithstanding the verdict).

B.    <u>The Breach of Contract Claims</u>.

1.    <u>Failure to Maintain a Nationwide System of Licensees</u>.

In support of its claim that FleetCor is contractually

obligated to maintain a nationwide system of licensees, plaintiff

relies on two recitals on the first page of the October 1995

license agreement saying that:

> Licensor has developed and is continuing to
> develop certain unique methods and techniques known as
> the "Fuelman" system for the provision of fuel and
> computer-generated reports detailing fleet and vehicle
> fuel consumption to vehicle fleet owners, through the
> means of licenses.
>
>      . . . .
>
> Licensor licenses licensees to operate businesses
> under the name "Fuelman."

Mot., App. at 8.   Those recitals are nothing more than non-

contractual statements of an expectation FleetCor had in October

1995 for the development of its Fuelman System.   The court is

persuaded that the recitals did not cause FleetCor to be

obligated to develop and maintain a nationwide network of Fuelman

System licensees.[4]   Moreover, as FleetCor maintains in its

_____

[4]For all practical purposes, plaintiff failed to respond to the
part of FleetCor's motion directed to the theory that it breached the
                                                  (continued...)

motion, plaintiff failed to adduce any evidence that it suffered any injury from FleetCor's termination of the other licenses.  As a result, plaintiff has failed to show the existence of a genuine issue of material fact as to the damage element of this breach of contract theory.

    2.   <u>Establishing Fuelman Locations Within the DFW Territory</u>.

The provisions of the license agreement that are pertinent to this alleged breach of the agreement are as follows:

    1.1  <u>Grant of License</u>.  Licensor hereby grants to Licensee and Licensee hereby accepts from Licensor the following rights and license for the term and upon the conditions hereinafter set forth:

    A.  To establish the exclusive right to operate a "Fuelman" license in the "Licensed Territory" outlined in Exhibit C;

. . . .

    B.  To establish, operate and service "Fuelman" card accepting stations (locations) in the "Licensed Territory";

    (1)  Licensee understands and agrees that its license to operate a license under the name "Fuelman" or any other name or mark of Licensor is exclusive in the geographic area outlined in Exhibit C. <u>The exclusivity of said license</u> to use the "Fuelman" name or any other trade name delineated in this Agreement <u>shall not, however, prohibit Licensor from entering into agreements for the use or acceptance of "Fuelman" cards at locations within said "Licensed Territory."</u>

---

[4](...continued)
license agreement by terminating the other licensees.  During the October 19, 2006, telephone conference/hearing, counsel for plaintiff virtually admitted that this theory is without support in the language of the license agreement.  Tr. of Oct. 19, 2006, Conf./Hr'g at 11.

Mot., App. at 9 (emphasis added).  The facts related to this
breach of contract claim do not appear to be in dispute.  After
the license agreement was made, FleetCor entered into agreements
with several national fuel retailers, such as Shell and Circle K,
to add the retail outlets of those merchants across the country
to the Fuelman card-acceptance network.  Mot., App. at 4, ¶ 15.
Some of those merchants had retail outlets in the DFW territory,
and now accept Fuelman cards pursuant to their agreements with
FleetCor.  The court is persuaded that these facts do not
establish a violation of the license agreement.  The exception to
exclusivity saying that the agreement does not "prohibit
[FleetCor] from entering into agreements for the use or
acceptance of 'Fuelman' cards at locations within [the DFW
territory]," Mot., App. at 9, appears to apply.

    The court will consider at a later point in this memorandum
opinion plaintiff's contention that the favored nations provision
of the Bridging Agreement would enable it to incorporate into the
license agreement language that would eliminate the exception to
exclusivity in the DFW territory.

    3.   Elimination of Pre-Purchase Controls.

    There is nothing in the license agreement that explicitly
prohibits FleetCor from entering into agreements with national,
or other, merchants for the use of Fuelman cards that eliminate
some of the pre-purchase controls on Fuelman System transactions.
Nevertheless, the court is inclined to think from the summary
judgment record that the pre-purchase controls feature of the

Fuelman System is such an integral part of the system that
actions taken by FleetCor to defeat to a significant extent that
feature of the system could well constitute the breach of an
implied term of the agreement.  In his affidavit, Barney Holland
makes a compelling case for the existence of an implied
understanding, saying, <u>inter alia</u>, that:

> The Fuelman Program uses pre-purchase controls
> that enable a fleet owner to restrict a driver's
> purchase of types and grades of fuel, gallons per fill-
> up, gallons per week, and fueling transactions per week
> and/or day.  These pre-purchase controls are a
> distinguishing factor between the Fuelman Program and
> other programs offered by FleetCor competitors.  These
> pre-purchase controls provide fleet owners with tools
> to better manage their total cost of fueling and reduce
> or eliminate theft.  These pre-purchase controls are
> used in marketing and promoting the Fuelman Program.
>
> . . . .
>
> FleetCor has entered into agreements with national
> merchants that enable Fuelman cards to be used in the
> CRIND in the D/FW Territory and that such agreements
> result in the removal of BHOC's VeriFone devices that
> operate all the requisite pre-purchase controls.  It is
> the VeriFone device, which FleetCor required BHOC to
> purchase and install at every one of its locations in
> the D/FW Territory (now approximately 600 locations),
> that enables the pre-purchase controls to operate.
>
> . . . .
>
> Without the pre-purchase controls, the Fuelman
> card is simply a credit card.  Without pre-purchase
> controls, it is unlikely that fleet owners would be
> willing to pay above posted retail prices.  With the
> pre-purchase controls operational, the driver of a
> commercial truck that operates on diesel may be limited
> to 20 gallons of diesel a day.  No other purchase will
> be authorized or processed.  If that driver attempts
> later to fill up his SUV with 15 gallons of premium
> gasoline, the transaction is denied.  But at one of the
> new "locations" established by FleetCor within BHOC's
> exclusive D/FW Territory, the transaction will be
> completed.  BHOC's representations to its customers,
> such as the Fort Worth ISD and Tarrant County, will

14

become misrepresentations, resulting in BHOC incurring losses in the form of having to make restitution to those customers where unapproved transactions occurred.

. . . .

BHOC has contracts and agreements with hundreds of fleet owner customers.  In every case, BHOC has represented to the customer that the Fuelman Program contains certain pre-purchase controls, including restrictions on type and grade of fuel.  In most instances, BHOC has contractually committed to the customer to maintain those pre-purchase controls.

Resp., App. at 17-19.

FleetCor admits that it has entered into agreements with national merchants, such as Shell, ExxonMobil, and Circle K, to allow Fuelman cards to be "swiped" or "read" at the fuel pumps at the places of business of the national merchants in a way that does not provide all pre-purchase controls that, according to Barney Holland's affidavit, have been an integral part of the Fuelman System.  First Am. Answer at 3-5, ¶¶ 9-13; Mot., App. at 3-4.  However, FleetCor contends that section 5.5 of the license agreement gave it the right to make such a change in the Fuelman System.  Section 5.5 reads as follows:

5.5  <u>Modification of System</u>.  Licensee recognizes and agrees that from time-to-time hereafter Licensor may change or modify the "Fuelman" system, including the adoption and use of new or modified tradenames, trademarks, service marks, manuals or new techniques, and that Licensee will accept and use for the purpose of this Agreement any such changes in the "Fuelman" system, including new or modified tradenames, trademarks, service marks, manuals or new techniques, as if they were part of this Agreement at the time of execution hereof.  Licensee will make such expenditures

15

as such changes or modifications in the system may
reasonably require, and do so within a reasonable time.

Mot., App. at 16.  The court is not persuaded that this contract
provision justifies the conduct of FleetCor in eliminating the
pre-purchase controls that undoubtedly are important to many of
the Fuelman System customers with whom plaintiff contracted
apparently on the legitimate belief that the controls would
continue.

4.   "Retail-Minus" National Merchant Agreement.

Undisputed facts pertinent to this breach of contract claim
are that (1) FleetCor entered into a Fuelman card agreement with
the entity that controls all Shell-branded stations nationwide
for the purchase of fuel on a retail-minus basis, First Am.
Answer at 5-6, ¶ 17; Mot., App. at 4-5, ¶¶ 16 & 17, and (2)
FleetCor and all of its Fuelman licensees have used a cost-plus
formula with some of their Fuelman merchants for years, First Am.
Answer at 5-6, ¶ 17.  FleetCor again places reliance on section
5.5 of the license agreement as legal justification for this
change in the Fuelman System.  The court agrees with FleetCor as
to the retail-minus claim.  Plaintiff has not provided summary
judgment evidence that would raise an issue that use of the cost-
plus formula is such an integral part of the Fuelman System that
FleetCor has impliedly committed not to change it.  There being
no express prohibition against such a change, the court concludes
that there should be a summary adjudication against plaintiff as
to this breach of contract theory.

5.   <u>Failure to Escrow the Fuelman Source Code</u>.

Plaintiff failed to respond to the part of the motion for summary judgment directed to the allegations of the complaint that FleetCor breached the license agreement by failing to escrow the Fuelman source code.  The court has not been able to find any provision in the agreements in question that would impose such an obligation on FleetCor.  Plaintiff does not dispute the statement in the declaration of Charles Freund that, while plaintiff and FleetCor negotiated over an agreement to place the source code in escrow, no agreement was ever reached.[5]  Mot., App. at 5, ¶ 18.  Therefore, the court concludes that this breach of contract claim is without merit.

6.   <u>Expert Assistance and Support</u>.

Other than a recital on the subject of expert assistance and support on the first page of the license agreement, Mot., App. at

---

[5]Section 10.18 of the license agreement reads as follows:

   10.18  <u>Escrow of Source Code.</u>  Licensor agrees to deposit all proprietary source code for software used in the operations defined in this Agreement with an escrow agent mutually agreed to by Licensor and Licensee and pursuant to the terms of an escrow agreement, in a form substantially similar to the escrow agreement attached as Exhibit E mutually acceptable to both parties.  Such source code may be contained in electronic or magnetic medium, and current to the date of this Agreement. Licensor also agrees to provide escrow agent with updated copies of source code as changes are made on an annual basis.  Licensee shall have the right to receive and use the source code upon the Licensor's default under this Agreement or upon Licensor's failure to continue in operation for whatever reason.

Mot., App. at 32-33.  The summary judgment record indicates that the parties never reached agreement on the form of an escrow agreement.

8, the only contractual provision contained in the license

agreement reads as follows:

>     4.1  <u>Services</u>.  Licensor agrees that it will
> perform the following services for the benefit of
> Licensee:
>
>     A.   Provide to Licensee or to Licensee's
> designated representative two (2) weeks (Monday through
> Friday) of training at Licensor's home office.  Said
> training shall include the basic information necessary
> to operate the licensed business, including marketing
> and sales techniques, accounting, record keeping and
> other business practices;
>
>     B.   Provide, on Licensee's request, the
> assistance of Licensor's advertising department or
> agency for Licensee's local advertising campaigns; and
>
>     C.   Provide, on Licensee's request, the
> assistance of Licensor's business consultants in those
> areas pertaining to the operation of the licensed
> business.
>
>         (1)  The cost of the training provided
> pursuant to (A) above shall be borne by Licensor;
> however, Licensee shall be responsible for all travel
> and living expenses of Licensee or Licensee's
> representative.  The cost of any assistance requested
> by Licensee pursuant to (B) and (C) of this Paragraph
> 4.1 shall be borne by Licensee as reasonably determined
> by Licensor.

Mot., App. at 14.

FleetCor maintains in support of its motion that plaintiff

can present no evidence that it ever requested any of the

specified kinds of training or assistance that FleetCor failed to

provide.  Indeed, plaintiff has not adduced any summary judgment

evidence in support of this breach of contract claim, with the

result that it is subject to summary disposition.

   7.  <u>Departure of Plaintiff's Employees</u>.

During the October 19, 2006, telephone conference/hearing counsel for plaintiff said that the confidentiality agreement on which this alleged breach of contract is based was not as broad as plaintiff originally believed it was, and that plaintiff no longer is asserting this breach of contract theory.  Therefore, summary adjudication against plaintiff as to this theory is appropriate.

    8.   <u>CFN; FleetAll; MasterCard</u>.

Charles Freund says in his declaration that FleetCor has not marketed any card under the name "FleetAll" in the DFW territory or anywhere else, and has not authorized anyone else to do so. Mot., App. at 5, ¶ 21.  In the same declaration, Freund says that FleetCor has not introduced a MasterCard fleet card in the DFW territory, has no sales personnel in that territory to market the MasterCard to customers or potential customers of plaintiff, and has excluded the counties in the DFW territory from mailings by which FleetCor has marketed the MasterCard through direct mail. <u>Id.</u>, ¶ 20.  Plaintiff has presented no summary judgment evidence raising a fact issue in support of its FleetAll and MasterCard breach of contract claims.

As to the CFN breach of contract claim, FleetCor admits that in 2003 one of its subsidiaries acquired a business from CFN that contracts with numerous independent fuel merchants around the country who market their own fleet cards.  Br. in Supp. of Mot. at 16 n.13.  CFN processes the transactions on those cards, but does not issue cards to, contract with, or provide services to

the fleet-owner customers.  <u>Id.</u>  Plaintiff has not pointed to any contractual provision that appears to be applicable to the CFN arrangement, and the court can find none.

The court will consider under the next heading in this memorandum opinion plaintiff's contention that the favored nations provision of the Bridging Agreement gives it rights relative to use of FleetAll cards, MasterCard, and CFN facilities.

9.   <u>Favored Nations Provision</u>.

The favored nations provision contained in the Bridging Agreement reads in its entirety as follows:

> 11.   <u>Favored Nation's Provision</u>.  As additional consideration of Licensee's execution of this Agreement, Licensor agrees that if the license agreements or franchise agreements with any of the Licensees (as that term is defined in the Letter of Intent), grants to any other Licensee material terms or conditions in the license or franchise agreements that are more favorable than the terms and conditions of this Agreement, Licensor will notify Licensee of such material terms and conditions and, for no additional consideration, offer to amend this Agreement as well as the License Agreement so that it also contains such identical material terms and conditions.  Likewise, Licensor agrees that if Licensee learns of the fact that Licensor has granted more favorable material terms or conditions in any other license or franchise agreement with another Fuelman licensee or Gascard franchisee, Licensee will have the right to have such favorable material terms and conditions added to this Agreement, effective as of the date such terms and conditions were first added to another Fuelman licensee's or Gascard franchisee's agreement.

Mot., App. at 63.

There is no summary judgment evidence that the first sentence of the provision is applicable--there is no evidence of a license agreement or franchise agreement with "any of the

21

Licensees (as that term is defined in the Letter of Intent)."

Id.  Apparently plaintiff is relying on the second sentence.

Differences in the wording of the first and second sentences of the favored nations provision lead to a restrictive interpretation of the second sentence:

a.   The first sentence obligates FleetCor (a) <u>to notify</u> plaintiff of any other license agreement of a kind contemplated by the sentence that contains terms or conditions more favorable than the terms and conditions of the Bridging Agreement and (b) <u>to offer</u> to amend the Bridging Agreement "as well as the License Agreement so that it also contains such identical material terms and conditions."  Mot., App. 15 63, ¶ 11.  In contrast, the second sentence does not impose a notification obligation on FleetCor, but gives the plaintiff the right to benefit from more favorable terms and conditions in another license agreement only <u>if it learns</u> through its own devices of the existence of those terms and conditions and <u>makes known</u> its wish to have the more favorable terms added to the Bridging Agreement.

b.   As noted above, the first sentence expressly states that <u>the license agreement as well as the Bridging Agreement</u> are subject to being amended to contain terms and conditions contained in another license agreement of the kind contemplated by the sentence that are more favorable than the terms and conditions contained in the Bridging Agreement.  In contrast, the second sentence says that plaintiff will have the right to have more favorable terms and conditions of a license agreement added to the <u>Bridging Agreement</u> but makes no reference to adding anything to the license agreement.

23

The October 1995 license agreement contains what commonly is referred to as a merger clause, which reads as follows:

> 10.13  <u>Entire Agreement</u>.  This Agreement supersedes any and all other agreements, either oral or in writing, between the parties with respect to the subject matter hereof and contains all of the covenants and agreements between the parties with respect to said matter.  Each party to this Agreement acknowledges that no representations, inducements, promises, or agreements, orally or otherwise, have been made by any party, which are not embodied herein, and that no other agreement, statement or promise not contained in this Agreement shall be valid as binding.

Mot., App. at 32.

FleetCor maintains that the merger clause causes the favored nations provision in the earlier-made Bridging Agreement no longer to be operative.  The court is not persuaded by that contention.  The wording of the provision makes clear that the parties intended that it would survive the later making of a license agreement--otherwise, they would not have included the "as well as the License Agreement" language in the first sentence.  Alternatively, FleetCor argues that because the second sentence of the provision contemplates that the more favorable terms will be added only to the Bridging Agreement, plaintiff is wrong in contending that it can elect to have more favorable terms it learns of added to the license agreement.  At first blush, this argument seems to have merit.  But the argument does not give effect to the final section of the license agreement, which reads as follows:

> 10.23  <u>Bridging Agreement</u>.  In the event of any conflict between the terms of this Agreement and the terms of the Bridging Agreement signed by the parties

24

on __Feb. 22__, 1995 ("Bridging Agreement"), the terms
of the Bridging Agreement shall control.

Mot., App. at 34.

There would appear to be a conflict between the first
sentence of the favored nations provision and the merger clause
because the first sentence makes clear that the parties intended
in those instances where the first sentence is applicable that
the more favorable terms or conditions of a license agreement to
which it applies will, at the option of plaintiff, become a part
of the prospective license agreement between the parties.
Similarly, if plaintiff chooses to add terms and conditions to
the Bridging Agreement based on the language of the second
sentence of the favored nations provision, those terms and
conditions would prevail over the terms of the license agreement
to the extent of a conflict between them.

The court is not prepared at this time to make summary
rulings against plaintiff on its contention that the favored
nations provision has the potential to cause plaintiff to benefit
from more favorable terms and conditions contained in license
agreements between FleetCor and third persons.  However, the
court is not satisfied that plaintiff gains a benefit from the
allegedly more favorable terms and conditions it has attempted to
incorporate into its license agreement with FleetCor.

Plaintiff has placed into the summary judgment record a copy
of an August 31, 2006, letter directed by plaintiff to FleetCor
making known plaintiff's election to include in the license
agreement between plaintiff and FleetCor certain terms and

25

provisions contained in (a) an agreement between FleetCor and A. N. Rusche Distributing Company ("Rusche") dated December 18, 1996, as modified by an addendum dated the same date, (b) an amendment dated August 30, 2001, to an agreement between FleetCor and WESCO, and (c) an August 27, 2002, addendum to an agreement between FleetCor and Cardlock Fuel System ("Cardlock").  Resp., App. at 222-24.[6]  The court has concluded for the reasons given below that those terms and conditions would not benefit plaintiff even if made a part of plaintiff's license agreement:

a.   The Rusche Agreement.

The two Rusche documents on which plaintiff relies, one of which shows to be an addendum to the main document, appear to have been executed simultaneously on December 18, 1996.  Resp., App. at 89, 119.  Plaintiff claims a benefit of an allegedly more favorable position in section 1.1A of the main document, which is a provision that was replaced in its entirety, and supplemented, in the addendum.  Id. at 90, 119-20.  Thus, the court focuses on the language of the addendum.

Plaintiff contends that it is entitled to the benefit of two allegedly more favorable provisions in the Rusche agreement. First, plaintiff says that the Rusche agreement "provide[s] that

---

[6]Although there are other contractual documents between FleetCor and what appear to be other FleetCor licensees, id. at 145-92, 210-13, there is no evidence that plaintiff elected to adopt in its agreement or agreements with FleetCor any term or condition from these other documents.  Be that as it may, the adoptions sought to be accomplished by the August 31, 2006, letter appear to involve all of the allegedly more favorable terms and conditions that are contained in any of the documentation included in the appendix.

the licensee is entitled to the exclusive right to establish
sites accepting Fuelman cards within the licensed territory,
subject to exceptions that are not applicable to the facts of
this case."  Br. in Opp'n at 7, ¶ 1.  Apparently plaintiff has
reference to the part of section 1.1A of the Rusche agreement (as
contained in the addendum) that is worded as follows:

> Except as hereafter set forth in this Agreement,
> including, but not limited to, Section 5.15 hereof,
> Marketer's license pursuant to this Agreement is
> exclusive in the Licensed Territory as to use of the
> names Fuelman and GASCARD, as to obtaining Fuelman
> and/or GASCARD access card customers, and as to
> establishing sites accepting Fuelman and GASCARD access
> cards; <u>provided that</u>, the <u>exclusivity of said license
> pursuant to this Agreement shall not: (1) prohibit
> Licensor from entering into agreements involving the
> territories of more than one of Licensor's marketer's
> [sic] providing for the acceptance of Fuelman and/or
> GASCARD access cards at locations within said Licensed
> Territory, operated directly through Licensor</u>; . . . .

Resp., App. at 119 (emphasis added).  Plaintiff's argument seems
to be that this language would prohibit FleetCor from
establishing Fuelman locations within the DFW territory.  <u>See
supra</u> at 14-16, subsection 2.  The court is not persuaded that
the Rusche language accomplishes that result.  It contains an
exception that allows FleetCor directly to enter into with
merchants, such as Shell and Circle K, for acceptance on a
nationwide basis, including within the DFW territory, of Fuelman
access cards.  Consequently, the provision, if incorporated into
the license agreement, would not have been breached by FleetCor's
arrangements with the national fuel retailers about which
plaintiff complains.

The second benefit plaintiff claims to gain from the Rusche agreement is found in the last paragraph of the replacement section 1.1A, and reads as follows:

> In the event Licensor enters into an agreement with another party for the acceptance of Fuelman and/or GASCARD, or any other fleet card in the Licensed Territory, as exempted in Section 1.1A(i) and (ii), Licensor shall compensate Marketer for any business lost to any additional acceptance site that does not accept such cards on a cost-plus basis within appropriate network guidelines and will credit the same gallons towards volume requirements.

Resp., App. at 120.  Plaintiff urges that this provision, if incorporated into its license agreement, would benefit it by "provid[ing] that FleetCor will compensate [plaintiff] for any business lost to any acceptance site that does not accept cards on a 'cost-plus' basis."  Br. in Opp'n at 7, ¶ 2.  The court has concluded that this provision would not benefit plaintiff in this action because here plaintiff is not contending that it lost any business to any additional acceptance site that does not accept Fuelman cards on a cost-plus basis within appropriate network guidelines.  Rather, plaintiff's complaint is that the retail-minus agreement between FleetCor and the entity that controls Shell-branded stations nationwide, supra at 19, subsection 4, has cut its profit margin and made projection of future profits more difficult, see 1st Am. Compl. at 6-7, ¶ 17; Br. in Opp'n at 16-18, § 3.  Even if plaintiff were to be given the benefit of this loss-of-business provision, the provision would not appear to have relevance to any of plaintiff's breach of contract claims.

b.    The WESCO Agreement.

28

The allegedly more favorable term and condition in the August 30, 2001, amendment to the WESCO license agreement is as follows:

> Exclusive Rights to New Products/Services. Marketer will have the "exclusive rights" to market in the Licensed Territory new products and services offered by Licensor. Neither the Licensor nor anyone acting on its behalf will circumvent Marketer to market directly to their customers.

Resp., App. at 205. Plaintiff apparently contends that if it were to be given the benefit of this exclusive-rights provision in its license agreement with FleetCor, FleetCor would have breached it by "marketing the CFN and ComData products and services (the 'FleetAll' and MasterCard) in the DFW Territory without first offering such products and services to [plaintiff]." 1st Am. Compl. at 8-9, ¶ 20. The summary judgment record establishes the lack of merit of this contention--there is undisputed summary judgment evidence that FleetCor has not marketed any card under the name "FleetAll" in the DFW territory or anywhere else, FleetCor has not made any attempt to market a MasterCard in the DFW territory, and FleetCor's CFN arrangement does not involve the provision of a product or service by FleetCor. See supra at 22-23, subsection 8. For those reasons, plaintiff would not benefit from the exclusive-rights provision even if it were deemed to be a part of its license agreement with FleetCor.

    c.   The Cardlock Agreement.

The provision in the August 27, 2002, agreement between FleetCor and Cardlock upon which plaintiff relies is worded as follows:

> 18.  <u>Choice of Law</u>.  It is expressly agreed and stipulated that this Agreement shall be deemed to have been made in and shall be interpreted under and governed by the laws of the State in which the corporate headquarters of the Licensor is domiciled.

Resp., App. at 202.  According to plaintiff, the benefit it would gain from this provision if it were a part of its license agreement is that "Georgia law, the state of FleetCor's domicile, not Louisiana law, will apply."  Br. in Opp'n at 7, ¶ 4.  There is no allegation in the amended complaint directed to this subject, nor has anything been brought to the court's attention to demonstrate that plaintiff would be any better off in this particular action if the laws of Georgia rather than the laws of Louisiana governed the resolution of the legal issues in this case.[7]

*       *       *       *       *       *

There might well be other reasons that the court has not explored why plaintiff cannot benefit in this case from the provisions of the Rusche, WESCO, and Cardlock agreements it seeks to incorporate into its agreement with FleetCor[8]; however, the

---

[7]The only comparison plaintiff makes between the laws of Georgia and Louisiana is the statement in its brief in opposition that "[w]hether Texas, Georgia, or Louisiana law applies, the elements of a breach of contract lawsuit are straightforward."  Br. in Opp'n at 6.

[8]For instance, the court has not reached a conclusion as to whether plaintiff has the right to adopt a favorable term and
(continued...)

reasons given above are sufficient to cause the court to conclude that summary adjudication in favor of FleetCor is appropriate on that subject. Such an adjudication will be without prejudice to the right the court has concluded that plaintiff has to receive from FleetCor on request for review license agreements between FleetCor and other licensees, see Epic Sys. Corp. v. Allcare Health Mgmt., 2002 WL 31051023 (N.D. Tex. 2002), and to urge that it is entitled to the benefit of any more favorable terms and provisions of which plaintiff learns as a result of such review or by other means.[9]

C.    The Tortious Interference Claim.

There is no summary judgment evidence that would support a tortious interference claim against FleetCor. While FleetCor might well have breached its license agreement with plaintiff by making arrangements that eliminated certain pre-purchase controls at outlets in the DFW territory, and those arrangements might well have been at variance with contractual commitments plaintiff had with its Fuelman System customers, the undisputed summary judgment evidence leads to the conclusion that FleetCor took the action it took in a good-faith belief that it had a contractual right to do so. The literal wording of section 5.5 of the

---

[8](...continued)
condition from a license agreement between FleetCor and another party without, at the same time, being burdened with less desirable features of the agreement. Neither party provided the court meaningful legal authority on that subject.

[9]Of course, plaintiff will not be entitled to assert in a later action the precise claims it unsuccessfully has urged in this action.

license agreement, Mot., App. at 16, gave FleetCor the right from time-to-time to change or modify the Fuelman System.  As noted above, <u>supra</u> at 16-19, subsection 3, the court has concluded that the obligation not to eliminate cost-control features is not expressed in the contract but is an implied obligation.  The court is satisfied from undisputed evidence in the summary judgment record that in eliminating the cost-control features at issue FleetCor was of the not unreasonable belief that it was exercising a contractual right and that it did so in good faith, not with the intent to harm plaintiff.  No evidence in the summary judgment record would support a contrary finding or conclusion.

D.   <u>Plaintiff's *De Facto* Termination Theories</u>.

Plaintiff's <u>de facto</u> termination theories are not supported by any summary judgment evidence.  There is no summary judgment evidence that would support a conclusion that FleetCor took any of the actions of which plaintiff complains for the purpose of destroying, or interfering with, the operation by plaintiff of its FleetCor System business.  Consequently, the court is summarily ruling against plaintiff on its <u>de facto</u> termination theories.

IV.

<u>Conclusion and Order</u>

For the reasons given above, the court has concluded that all of the theories for relief asserted by plaintiff in its first amended complaint other than the breach of contract theory based

32

on alleged elimination of pre-purchase controls should summarily
be resolved against plaintiff.  Therefore,

The court ORDERS that FleetCor's motion for summary judgment
be, and is hereby, granted as to all theories for relief other
than plaintiff's claim that FleetCor breached its license
agreement with plaintiff by entering into agreements with
merchants for the use of Fuelman cards that eliminate some of the
pre-purchase controls on Fuelman System transactions.

The court further ORDERS that all claims and causes of
action asserted by plaintiff against FleetCor in the above-
captioned action, other than its claim that FleetCor breached its
license agreement with plaintiff by entering into agreements with
national, or other, merchants for the use of Fuelman cards that
eliminate some of the pre-purchase controls on Fuelman System
transactions, be, and are hereby, dismissed.

The court further ORDERS that in all future activity in this
action, including discovery, the preparation of the required
pretrial order, preparation of any verdict form, and trial
presentation, be consistent with the rulings made herein.

SIGNED December  27 , 2006.

_____/s/ John McBryde_____
JOHN McBRYDE
United States District Judge

33